UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---------------------------------------------------------------------------------------------------

In re:                                                                 Case Number:  09-15128-7

     LAYNE DEAN SASSE,

             Debtor.

-----------------------------------------------------------------

     RICE, HEITMAN & DAVIS, S.C.,

             Plaintiff,

v.                                                                     Adversary Number: 09-219

     LAYNE DEAN SASSE,

             Defendant.

---------------------------------------------------------------------------------------------------

MEMORANDUM OPINION, FINDINGS OF FACT,
AND
CONCLUSIONS OF LAW

    As a social concept, the notion of bankruptcy has existed in some form for

hundreds of years.[1]  The essential importance of the discharge – providing the

"honest but unfortunate" debtor with a fresh start unfettered from the burden of

debt – is largely an American construct, and the United States has often been

regarded as offering the most "liberal" discharge laws in the world.[2]  More recently,

---

    [1] See Charles Jordan Tabb, "The Historical Evolution of the Bankruptcy Discharge,"
65 Am. Bankr. L.J. 325 (May 1991) ("Bankruptcy has been around for almost half a
millennium in Anglo-American jurisprudence").

    [2] Id. at 325.  Indeed, "a strong pro-debtor policy has been a linchpin of the national
bankruptcy laws for more than ninety years." Id. at 370.

of course, the steady rise in bankruptcy filings has been cited as evidence that the "stigma" of bankruptcy has faded, and that the bankruptcy system has been too generous to debtors.[3]  What seems clear is that it remains the rare individual who actively anticipates filing for bankruptcy, deceives his creditors with insincere promises "never" to file, and only then seeks to discharge his debts.[4]  In this case, the plaintiff submits that the debtor, Layne Sasse, is exactly such a person.[5]

In 2004, the debtor was involved in an altercation outside a bar in La Crosse, Wisconsin.  In a subsequent lawsuit stemming from the incident, the

---

[3] See Rafael Efrat, "Bankruptcy Stigma: Plausible Causes for Shifting Norms," 22 Emory Bankr. Dev. J. 481, 485 (Spring 2006) ("[J]urists, government officials, scholars, members of the credit industry, as well as popular culture media report the stigma traditionally associated with bankruptcy has declined in [the] recent past.").  The skepticism toward bankruptcy is evidenced by the arguments in support of the "means test" components of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  See Morse v. Rudler (In re Rudler), 576 F.3d 37, 40 (1st Cir. 2009) (noting that BAPCPA was enacted in response to concerns that bankruptcy relief was "too readily available" and "sometimes used as a first resort, rather than a last resort"); see also Hon. Edith H. Jones and Todd J. Zywicki, "It's Time for Means-Testing," 1999 BYU L. Rev. 177, 185 ("Traditionally, bankruptcy was seen as a last resort, a remedy for those truly down on their luck, not a device for income-earning, middle-class families to walk away from their promises and shift the losses from themselves to others."); Brian Rothschild, "The Illogic of No Limits on Bankruptcy," 23 Emory Bankr. Dev. J. 473, 511 (Spring 2007) ("Bankruptcy, far from benefitting creditors and debtors, is burdening them.").

[4] In March of 2010, The United States Trustee Program issued its public report on debtor audits conducted by the program during fiscal year 2009.  The report indicated finding a high incidence of "material misstatements" or errors in the bankruptcy schedules subject to audit.  However, the program also noted that in "many instances" no action was taken in regard to these errors because the debtors either corrected the mistake or the misstatement did not appear to be intentional.  See Public Report: Debtor Audits by the United States Trustee Program Fiscal Year 2009 at 4, located at http://www.justice.gov/ust/eo/public_affairs/reports_studies/docs/Debtor_Audits_FY_2009_Public_Report.pdf (last accessed July 21, 2010).  This is consistent with the Court's experience over nearly a quarter of a century that bankruptcy petitions and schedules are often not as complete as they could be, but are rarely fraudulently prepared.

[5] The plaintiff was represented at trial by Terry A. Davis, a member of the firm and Mr. Sasse's former attorney.  Brian K. Murphy represented Mr. Sasse at trial.

injured party contended that the debtor wrongfully assaulted him with a beer mug.[6]

The debtor hired Terry Davis, a member of the law firm which is now the plaintiff in

this adversary proceeding, to serve as his defense attorney. While the lawsuit

dragged on, Mr. Davis became concerned that the debtor might not have the ability

to pay his fees.[7] The parties apparently had several conversations about payment,

including at least one conversation in which Mr. Davis advised the debtor about the

"bankruptcy option."[8] Mr. Davis referred the debtor to another attorney in

La Crosse who handled bankruptcy cases for an opinion, and noted in his

correspondence to the debtor that "[i]n the event you file bankruptcy, my fees

would also be discharged."[9] It is unclear whether the debtor actually contacted a

bankruptcy attorney at this time, although in a subsequent letter Mr. Davis stated,

"I understand you are following my recommendation to see [the bankruptcy

attorney]."[10]

Mr. Davis testified that in September 2006, he met with the debtor about the

case and again discussed the issue of his fees. At this time, the balance due was

---

[6] See Plaintiff's Statement of the Case at 1.

[7] According to Mr. Davis, the debtor paid only $2,500 in fees, with "minimal" incremental payments from January 2006 until July 2008. The debtor was supposed to pay him a retainer of $4,000 but paid only $1,500, and Mr. Davis provided as Exhibit 1 a series of letters written to the debtor which repeatedly requested payment of the outstanding fees.

[8] See Plaintiff's Exhibit 1 (letter of July 14, 2006).

[9] See Plaintiff's Exhibit 1 (letter of July 14, 2006).

[10] See Plaintiff's Exhibit 1 (letter of July 18, 2006). During the meeting of creditors, the debtor stated that he did not consult with the recommended attorney and only spoke with him to tell him that he wasn't interested in filing bankruptcy. See Plaintiff's Exhibit 3 on the sixth unnumbered page. There was no testimony to the contrary during the trial.

$4,012.28.[11]  Mr. Davis testified that it was during this meeting that the debtor

clearly promised that he would not file bankruptcy, and that even if he did, he

would not file "on" his attorney.  In the letter which appears to memorialize this

meeting, Mr. Davis again referenced his concern that "given a bankruptcy" his firm

might not be paid for its work, and he wrote that "I am just not willing to be your

lender at the risk of losing all my fees based upon a bankruptcy, if it eventually

occurs."[12]  The letter does not mention the debtor's promise not to file bankruptcy,

but it is worth noting that none of Mr. Davis's subsequent letters reference the

concern about a bankruptcy filing.   Despite repeated requests, the debtor did not

bring his account current and Mr. Davis asked that the debtor sign a consent order

allowing him to withdraw as counsel in June of 2008.[13]

Mr. Davis did not, however, withdraw from the case.  Instead, he continued

working on the debtor's behalf, and the underlying state court case was ultimately

settled for, as he puts it, minimal money.[14]  The settlement was finalized in early

May of 2009.  The debtor first met with his current bankruptcy attorney after the

state court matter was settled, and this case was filed on July 31, 2009.[15]  Of

---

[11] See Plaintiff's Exhibit 1 (letter of September 15, 2006).

[12] See Plaintiff's Exhibit 1 (letter of September 15, 2006).

[13] See Plaintiff's Exhibit 1 (letter of June 5, 2008, and letter of July 2, 2008).  The debtor did indicate he made some payments, about $1,000, on the account.  See Defendant's Statement of the Case at 2.

[14] See Plaintiff's Statement of the Case at 2.  According to Mr. Davis, the debtor had to pay $800 and turn over a big screen television; the rest of the settlement amount was funded by the debtor's insurance company.

[15] Four days before the bankruptcy was filed, Mr. Davis wrote the debtor and
(continued...)

course, Mr. Davis's fees were listed among the debts in the debtor's schedules.

Mr. Davis filed this adversary complaint because he believes that the debtor lied to

him and fraudulently induced him to continue his representation in the state court

lawsuit. He feels that he justifiably relied upon the debtor's promise not to file

bankruptcy (or, at least, not to file bankruptcy "on" the claim for attorney's fees),

and that his claim for attorney's fees constitutes an obligation for money or credit

the debtor "obtained" through fraud.

Mr. Davis is also concerned with what happened when this case was filed.

As part of his bankruptcy petition, the debtor prepared a Form B22A, the chapter 7

statement of current monthly income and means-test calculation (otherwise known

simply as the "means test"). In his means test form, the debtor indicated that he

had current monthly income of $3,043.91 and that he was part of a one-person

household. His annualized current monthly income as listed on line 13 of the

means test was $36,526.92, which was less than the applicable median family

income of $42,816.00 for a single person household. This meant that the debtor

was "below median income" and that his bankruptcy filing was not subject to

scrutiny under the "presumption of abuse" found in 11 U.S.C. § 707(b)(2)(A). The

U.S. Trustee's office did not file a motion to dismiss for abuse (whether presumed

---

[15](...continued)
indicated that if the debtor did not contact him to discuss payment arrangements, he would
start legal action to collect the account. According to Mr. Davis's letter, the outstanding
balance at that time was $12,499.83. See Plaintiff's Exhibit 1 (letter of July 27, 2009). The
debtor's attorney submitted a copy of a calendar page indicating he may have first met Mr.
Sasse on June 30, 2009. See Defendant's Exhibit 13. At the meeting of creditors
conducted in September 2009, the debtor indicated he met with his attorney "about three
months ago." See Plaintiff's Exhibit 3 on the sixth unnumbered page.

or under the "totality of the circumstances"), and the case proceeded.  The chapter

7 trustee filed a no-asset report on September 1, 2009, the debtor filed his

certification of completion of the required financial management course on October

19, 2009, and the deadline for filing objections to discharge expired November 2,

2009.  The debtor was eligible for a discharge after that date.[16]

**I.     Motion to dismiss under § 707(b) or, in the alternative, to revoke the debtor's discharge.**

Shortly before the scheduled trial date, the plaintiff filed a motion to dismiss

the bankruptcy case for abuse under § 707(b) or, in the alternative, to revoke the

debtor's discharge.[17]  The plaintiff believes that the debtor improperly completed

his means test by omitting the income of his girlfriend, who lives with him.  Under

the plaintiff's calculations, if the girlfriend's income was included, the debtor would

have failed the "presumption of abuse" under § 707(b)(2)(A).  According to the

plaintiff, the girlfriend's income of $1,505.00 per month should be added to the

debtor's current monthly income because she deposited her income into a joint

bank account with the debtor.  Under this calculation, the debtor's current monthly

income would be $4,548.00, which would result in an annualized current monthly

---

[16]   This adversary proceeding was filed on October 30, 2009.  Neither the plaintiff nor any other party in interest objected to the debtor's discharge under 11 U.S.C. § 727(a), and a discharge would have normally been issued despite this adversary proceeding, as the discharge order notes that it does not affect any pending proceedings to determine dischargeability of a particular debt.  For some reason, the discharge was not entered.  As will be discussed below, this poses a minor conceptual dilemma but is ultimately not critical to the outcome.

[17]   As indicated, the order of discharge had not been issued as of the date of trial. Consequently, it would be difficult to "revoke" the discharge, although the request could be characterized as something of a preemptive strike or, if nothing else, an objection to the issuance of the discharge in the first instance.

income of $54,576.00.  This, submits the plaintiff, "puts him [the debtor] over the

Means Test by $11,760."[18]  From this conclusion, the plaintiff extrapolates two

further contentions: that either the case should be dismissed under § 707(b)(2)

because the debtor has failed to rebut the presumption of abuse, or that the

debtor's discharge should be denied/revoked because he "fraudulently" prepared

the means test form.

There are several problems with this.  First of all, a motion to dismiss for

abuse under § 707(b) may be filed "only within 60 days after the first date set for

the meeting of creditors," unless the court for cause extends the time for filing the

motion to dismiss on a request filed before the time expired.  See Fed. R. Bankr. P.

1017(e); see also Morse v. Rudler (In re Rudler), 576 F.3d 37, 44 n.10 (1st Cir.

2009) ("These various provisions ensure that motions under section 707(b) are

made early in the bankruptcy case"); In re Ansar, 383 B.R. 344, 348 (Bankr. D.

Minn. 2008) (motion to dismiss for abuse may only be filed within 60 days of the

first date set for the meeting of creditors); In re Byrne, 376 B.R. 700, 704 (Bankr.

W.D. Ark. 2007) (same).[19]  Put simply, the plaintiff's request to dismiss the case

under § 707(b) is untimely.  In re Russo, 2008 WL 5412106, at *4 (Bankr. E.D. Pa.

Oct. 20, 2008).

---

[18] See Plaintiff's Statement of the Case at 4.

[19] For purposes of clarity, the Court notes that Rule 1017(e)(1) provides that the
60-day deadline applies "[e]xcept as otherwise provided in § 704(b)(2)."  Under
§ 704(b)(2), the U.S. Trustee is expected to file motions to dismiss for presumed abuse
within 30 days after the filing of the "10 day" statement required by § 704(b)(1)(A).  The
general deadline is applicable to the plaintiff's motion.

7

In response, Mr. Davis suggested that the 60-day period should be equitably tolled in some fashion because the "fraud" was not discovered until depositions were taken in early March of 2010 in which the debtor's girlfriend acknowledged depositing her paychecks into the joint account. However, at the meeting of creditors, the chapter 7 trustee asked the debtor how many people lived in his current household, and the debtor responded by saying "I live there and my girlfriend lives there."[20] The transcript of the meeting of creditors indicates that Mr. Davis attended and questioned the debtor. He knew, or should have known, that the debtor lived with his girlfriend, and he has not explained why he did not investigate their relationship prior to the expiration of the 60-day period, or why he did not request an extension of the deadline.

The plaintiff has not offered any evidence that the debtor attempted to conceal his relationship with the girlfriend, the fact that she lived with him, or that she both earned an income and had expenses of her own. This case was filed on July 31, 2009. The meeting of creditors was scheduled for September 1, 2009. A motion to dismiss under § 707(b) should have been filed by November 2, 2009. The plaintiff's motion was filed March 31, 2010, almost six months after the deadline had passed. The purpose of Rule 1017(e) is to assure that 707(b) motions are made early in the case. Rudler, 576 F.3d at 44 n.10. The plaintiff has not demonstrated any justifiable reason to excuse compliance with the express terms of Rule 1017(e), and in the context of a motion to dismiss under 707(b), the

---

[20] See Plaintiff's Exhibit #3, on the last unnumbered page.

plaintiff's concerns about the debtor's means test calculations must be rejected as untimely.

Despite the fact that the 707(b) motion was filed outside of the 60-day window, the Court allowed limited testimony about the preparation of the means test form to the extent that it was relevant to the question of either denying or revoking the debtor's discharge for purported "fraud" in the preparation of the bankruptcy petition. Complaints objecting to the debtor's discharge must be filed within 60 days of the first date set for the meeting of creditors. See Fed. R. Bankr. P. 4004(a). While this adversary proceeding was filed in a timely fashion, the plaintiff only sought a determination that *its* claim should be excepted from discharge.[21] Given that no objection to discharge was interposed prior to the deadline, the debtor would normally have received an order of discharge.[22] The plaintiff clearly received notice of the Rule 4004(a) deadline and is not entitled to object to the debtor's discharge under § 727(a) at this late date.[23] Instead, the

---

[21] The plaintiff's 523(a)(2)(A) claim also had to be brought within the 60-day window or it was discharged. See Fed. R. Bankr. P. 4007(c) ("a complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors").

[22] The fact that the discharge order was not issued shortly after November 2, 2009, appears to be an inadvertent oversight. It is permissible, and relatively routine, for a court to grant a discharge when no complaint objecting to discharge has been filed at the expiration of the 60-day period, notwithstanding a pending claim under § 523 seeking to exempt a particular debt from discharge. See Disch v. Rasmussen, 417 F.3d 769, 775 (7th Cir. 2005).

[23] The plaintiff suggests that the provisions of Rule 4004(a) are not jurisdictional, and cites Kontrick v. Ryan, 540 U.S. 443, 124 S. Ct. 906 (2004), for support. It is true that in Kontrick the Supreme Court affirmed the Seventh Circuit's ruling that the deadline to object to discharge is akin to an affirmative defense and is subject to waiver, estoppel, or equitable tolling. But the plaintiff has not demonstrated any basis for equitable tolling or

(continued...)

plaintiff's motion requests that the Court "revoke" the debtor's discharge under

§ 727(d), even though the discharge has not formally been issued.   Technically,

the plaintiff's request in this regard must be dismissed for failure to state a claim

upon which relief can be granted.   See Zedan v. Habash, 529 F.3d 398, 405 (7th

Cir. 2008) (complaint to revoke a discharge before it has been entered is properly

dismissed because "[a] bankruptcy court cannot revoke an order that it has never

issued").

Even if the discharge had been issued shortly after the November 2, 2009,

deadline, the plaintiff's claim would fail on the merits in any event.   Under

§ 727(d)(1), the court may revoke a discharge if the discharge was "obtained

through fraud of the debtor," and the requesting party did not know of such fraud

until after the granting of the discharge.   Revocation of discharge under § 727(d) is

an "extraordinary remedy to be sparingly applied."   Fokkena v. Peterson (In re

Peterson), 356 B.R. 468, 475 (Bankr. N.D. Iowa 2006).   The creditor has the

burden of proof on the issue of lack of knowledge, which is an essential component

of the claim.   Murrietta v. Fehrs (In re Fehrs), 391 B.R. 53, 80 (Bankr. D. Idaho

2008); Neary v. Darby (In re Darby), 376 B.R. 534, 539 (Bankr. E.D. Tex. 2007).

Dismissal of a § 727(d)(1) action is appropriate where, before discharge, the

---

[23](...continued)
waiver of the deadline.  Mr. Davis had plenty of opportunity to investigate prior to the
deadline and did not do so.  Further, unlike the situation in Disch, the plaintiff's § 727
concerns do not stem from the same set of operative facts as its claim under § 523(a).
See 417 F. 3d at 776 (late amendment of claim allowed in part because the § 727 claim
"arose from the same conduct, transactions, and occurrences" as the § 523 claim).
Consequently, there is no basis to permit the plaintiff to amend its complaint to incorporate
a § 727(a) objection, and in any event the plaintiff has not articulated a basis for the denial
of the debtor's discharge under that section.

creditor knows sufficient facts to constitute notice of a possible fraud, and the

burden is on the creditor to investigate diligently any fraudulent conduct before

discharge.  Mid-Tech Consulting, Inc. v. Swendra, 938 F.2d 885, 888 (8th Cir.

1991).

In this case, the only alleged fraud involved the preparation of a means test

form which did not include the income of the debtor's girlfriend.  The plaintiff,

through Mr. Davis, was aware that the debtor lived with the girlfriend because the

debtor testified to this fact at the meeting of creditors, which Mr. Davis attended.

Section 727(d)(1) provides creditors with "an incentive to actively investigate a

debtor for potential fraud before the period to object closes."  Zedan, 529 F.3d at

406.  Long before the time to object to discharge expired, Mr. Davis possessed

sufficient information to put him on notice of the purported "fraud," and he did not

take action.  A claim for revocation of discharge would thus fail on this ground as

well.

Ultimately, the plaintiff's claims under either § 707(b) or 727(d) rest on the

same contention: namely, that the debtor improperly calculated the means test.

The debtor filed his means test form indicating that he was the only member of his

"household."  As such, he excluded his girlfriend's income from the calculation of

his "current monthly income" on the means test form.  The debtor's argument is

that to the extent her contributions to their joint account could (or should) have

been disclosed on the means test form, he would have been entitled to modify the

means test and claim that he was part of a two-person household, rather than a

single person household.  Under the applicable income guidelines, the median

11

income for a two-person household at the time this case was filed was $57,657.00.

Even if all of the girlfriend's income was included on the means test form, the

debtor believes he would have still been considered below median income and not

subject to dismissal for presumed abuse.[24]

The precise method for calculating current monthly income has been the

subject of some debate since the enactment of BAPCPA.  Clearly, 11 U.S.C.

§ 101(10A)(B) contemplates that amounts paid (or contributed) by another to the

household expenses of the debtor must be included in the calculation of the

debtor's current monthly income.  But the statute does not require the inclusion of

all income from a third party when the funds are used to support a non-dependent

of the debtor.  In re Ellringer, 370 B.R. 905, 911 (Bankr. D. Minn. 2007).  In

Ellringer, the court rejected the idea that "if the debtor's household includes

[another person], then [that person's] entire income must be included in the

debtor's calculation of current monthly income."  Id.  Instead, a household

member's contributions should only be included to the extent that they were "used

to support the debtor or the debtor's dependents."  Id.

The testimony of the debtor and his girlfriend indicated that her expenses

were generally paid out of the joint account.  As the court observed in In re Roll,

400 B.R. 674 (Bankr. W.D. Wis. 2008), it would be "patently illogical" to conclude

that all of one household member's income is used to pay for the household

expenses of another, but that is precisely what the plaintiff proposes should be

_____

[24] As the plaintiff notes, inclusion of the girlfriend's income would have resulted in
an annualized current monthly income of $54,576.00, which is below the stated median
family income for a two-person household.

12

done in this case.  Had the motion to dismiss under § 707(b) been filed on a timely

basis, it would have been the creditor's burden to prove how much of the

girlfriend's income should have been imputed to the payment of the debtor's

expenses rather than her own.  Id. at 676.  The plaintiff was not able to

demonstrate that all of the girlfriend's income was used solely for the support of the

debtor.   More critically, the plaintiff cannot demonstrate why amending the means

test to include the girlfriend's income would not result in a corresponding increase

in the household size.

It is uncontested that the debtor and his girlfriend live together and use their

combined income to support themselves.  Are they members of the same

"household" for purposes of the means test calculation?  The Census Bureau

defines "household" as "all of the people, related and unrelated, who occupy a

housing unit."  In Ellringer, the court concluded that this definition is the most

appropriate one as § 101(39A)(A) defines median family income as "the median

family income both calculated and reported by the Bureau of the Census."  370

B.R. at 910.  According to this reasoning, Congress elected to use the broader

term "household size" on line 14(b) of Form B22A "in recognizing that there may be

reasons why two unrelated, non-dependent individuals should be treated as a

household for purposes of the means test."  Id. at 911.  Admittedly, other courts

have rejected this "heads on beds" approach and taken a more restrictive view of

"household size."  For example, in In re Jewell, 365 B.R. 796, 800 (Bankr. S.D.

Ohio 2007), the court observed:

> If a person lives in the home with the debtor but the debtor does not
> support that person, then inclusion of that person for purposes of
> calculating the applicable median family income and disposable
> income would give rise to a faulty calculation and would result in an
> inaccurate figure for both.

Similarly, in In re Herbert, 405 B.R. 165, 169 (Bankr. W.D.N.C. 2008), the court

concluded that while unrelated, non-dependent individuals may be part of a

household, the "heads on beds" approach is too broad because it includes

anybody who may be residing under the debtor's roof without regard to their

financial contributions to the household or the monetary support they may be

receiving from the debtor.

Under the Jewell approach, occupancy cannot be immediately equated with

household size. However, these courts have still rejected strict adherence to a

standard which would limit "household size" to those people claimed as

dependents on a tax return. See Jewell, 365 B.R. at 801 (such an approach "fails

to recognize those instances when a debtor may be actually providing support for a

household member"); Herbert, 405 B.R. at 169 (that standard "[does] not account

for the situation in which a debtor may be supporting an individual without

declaring that person as a dependent on his tax return"). Instead, these courts

examine the relationships of those living with the debtor and the financial

arrangements between them on a case-by-case basis because "debtors have a

variety of different living arrangements that defy being pigeonholed into a neat

formula for purposes of defining household size." Id.

More recent decisions have responded to the Jewell court's concerns about

the "heads on beds" approach by challenging its reliance on a case-by-case

14

examination of the debtor's financial commitments.  As one court observed,

Congress does not require courts to take into account the financial contribution of

other household members, their relationship to the debtor, or issues of

dependency when determining household size.  In re Smith, 396 B.R. 214, 218

(Bankr. W.D. Mich. 2008).  Or as another court concluded, "Absent Congressional

direction, it is inappropriate to consider a household member's dependency on the

Debtor when determining household size; accordingly, household should be

understood in the ordinary sense of the word."  In re Epperson, 409 B.R. 503, 507

(Bankr. D. Ariz. 2009).  More pertinent to the present case, in Epperson the court

observed that:

> Congress did not state that two unrelated roommates or a
> cohabiting couple should not be counted as part of the same
> household.  In the absence of Congressional guidance, it is
> unreasonable to conclude that two persons living in the same home
> are not a part of the same household.

409 B.R. at 507; see also Ellringer, 370 B.R. at 911 ("Households may be either

family or nonfamily . . . .  If Congress had intended to limit household size to only

household members related by blood, marriage, or adoption, it could have done

so").  Ultimately, under either the "heads on beds" approach or the "case-by-case"

approach, the debtor in this case could have claimed a household size of two,

because he and his girlfriend cohabitate and their shared income supports both of

them.  See Herbert, 405 B.R. at 170 (household size of 11 was allowed under

case-by-case approach because "[t]he reality of this debtor's situation is that he is

– and has been for several years – supporting his girlfriend, their daughter, and her eight children").[25]

In <u>Epperson</u>, the debtor had claimed a household size of two and included a "contribution" of $900 from a roommate in his monthly income calculation. The U.S. Trustee argued that the debtor needed to either include the roommate's entire income in the calculation of current monthly income, or that the debtor's household size should be reduced to one. According to the U.S. Trustee, the debtor sought to "have his cake and eat it too" by increasing the household size without a corresponding increase in income. 409 B.R. at 506.[26] In this case, it is the plaintiff who wishes to eat the cake; he wants the debtor to include all of his girlfriend's income as part of his current monthly income, but ignore the reality that she is part of the resulting "household." It is as if the plaintiff suggests that she is little more than a phantom, existing only to supply the debtor with additional income but never actually resting her head in a physical location.

The reality of this case is that the debtor and his girlfriend live together. If they did not live together, his household expenses for such things as rent, food, and utilities would likely change. Under the facts, it makes no difference whether

---

[25] In this regard, both the debtor and his girlfriend testified that the money that went into their joint account supported them both, and that in fact the debtor's funds undoubtedly subsidized or "supported" the girlfriend, whose income would otherwise have been insufficient to afford a similar lifestyle.

[26] The <u>Epperson</u> court disagreed with the U.S. Trustee's conclusion, finding it appropriate to leave the household size at two and only include the $900 contribution from the roommate as part of the debtor's current monthly income. "Including all of the Roommate's income would do violence to [the] statutory directive" found in § 101(10A)(B) that limits a third party's contribution to the current monthly income to the amount the third party pays toward "the household expenses of the debtor." 409 B.R. at 508.

he excluded her income from the calculation of his current monthly income and

then claimed a household of one or claimed a two-person household and either

attempted to allocate a portion of her income to the payment of "household"

expenses or claimed all of it as part of current monthly income.  Even if all of her

income was included in the means test calculation, the debtor would still be below

the median income for a household of two.  The plaintiff's purported "fraud" upon

the court involves a legal determination that may have an impact in some cases,

but has no practical effect in this one.

The paralegal for the debtor's attorney testified that they opted to list only his

income and claim the single household because they believed it appropriate to do

so.[27]  Presumably, they did so because they concluded that she did not make any

significant "contributions" to the debtor's support, or because they determined that

it made no practical difference in the outcome of the means test.  Given the

directive of Section 101(10A)(B), there may be instances in which another

household member makes sufficient contributions to the debtor's current monthly

income such that the debtor simply cannot claim a smaller household size or

exclude the totality of that person's income.  The burden is on the creditor,

however, to prove that the contributions are so substantial as to alter the equation.

Roll, 400 B.R. at 676; see also In re Justice, 404 B.R. 506, 519 (Bankr. W.D. Ark.

2009) ("As the objecting party, [the creditor] had the burden of proving that a

_____

[27] As the Epperson case indicates, this would appear to be the position of the U.S. Trustee program.  See 409 B.R. at 504 ("The UST argues that the Debtor must either include all of the Roommate's income in current monthly income or reduce the household size to one.").

17

portion of the amounts [the debtor] received were paid on a regular basis and paid

for the household expenses of the debtor and his dependents.").   Here, even

accepting the plaintiff's allegations at face value – i.e., even assuming for sake of

argument that every penny of the girlfriend's income could be imputed to the

debtor – the debtor's household size would justifiably increase and the debtor

would still be below median income.[28]   The debtor relied upon his attorney to

prepare the means test form, and the decision to claim only a single member

household did not materially misrepresent the debtor's financial situation.   There

simply is no "fraud" in the calculation of the means test, and there is no substantive

basis for dismissing the case or "revoking" the debtor's discharge.

## II.    Exception to discharge under 11 U.S.C. § 523(a)(2)(A)

Having resolved the problems the plaintiff perceived in the bankruptcy filing

itself, the Court now turns to the adversary complaint and the allegation that the

debtor "obtained" something from the plaintiff through a fraudulent representation

or actual fraud.   It is a fundamental axiom of bankruptcy jurisprudence that

exceptions to discharge are to be construed strictly against a creditor and liberally

in favor of the debtor.   See In re Scarlata, 979 F.2d 521, 524 (7th Cir. 1992).   A

plaintiff must prove all elements of the proffered exception to discharge by a

preponderance of the evidence.   Grogan v. Garner, 498 U.S. 279, 287-88, 111

---

[28] Consequently, even if the plaintiff's request to dismiss the case under § 707(b)
could be construed as timely, it would be precluded by the express provisions of
§ 707(b)(6), which states that "[o]nly the judge or United States trustee . . . may file a
motion under section 707(b)" if the debtor is below median income.  Further, not even the
U.S. Trustee can seek to dismiss a case under § 707(b)(2) if the debtor is below median
income.  See 11 U.S.C. § 707(b)(7).

S. Ct. 654, 659-60, 112 L. Ed. 2d 755 (1991).  In that regard, § 523(a)(2)(A)

prevents the discharge of debts for money obtained by "false pretenses, a false

representation, or actual fraud."  The statute requires proof of false or deceptive

conduct, fraudulent intent, and justifiable reliance.  <u>Mayer v. Spanel Int'l</u>, 51 F.3d

670, 674 (7th Cir. 1995).

In order to except a debt from discharge under this section, a creditor is

typically required to establish the following elements: (i) the debtor made a false

representation of fact, (ii) the debtor either knew the representation was false or

made the representation with reckless disregard for its truth, (ii) the representation

was made with an intent to deceive, and (iv) the plaintiff justifiably relied upon the

false representation.  <u>See</u> <u>In re Kimzey</u>, 761 F.2d 421, 423-24 (7th Cir. 1985),

<u>abrogated on other grounds by</u> <u>Grogan v. Garner</u>, 111 S. Ct. 654 (1991); <u>Vozella

v. Basel-Johnson (In re Basel-Johnson)</u>, 366 B.R. 831 (Bankr. N.D. Ill. 2007).  In

<u>McClellan v. Cantrell</u>, 217 F.3d 890 (7th Cir. 2000), the court noted that "actual

fraud" in the context of the statute is broader than, and need not take the form of, a

specific misrepresentation.  As the Seventh Circuit recognized,

> No learned inquiry into the history of fraud is necessary to establish
> that it is not limited to misrepresentations and misleading omissions.
> "Fraud is a generic term, which embraces all the multifarious means
> which human ingenuity can devise and which are resorted to by one
> individual to gain an advantage over another by false suggestions or
> by the suppression of truth. No definite and invariable rule can be laid
> down as a general proposition defining fraud, and it includes all
> surprise, trick, cunning, dissembling, and any unfair way by which
> another is cheated." [Citation omitted].

<u>Id.</u> at 893.

As the Supreme Court has repeatedly stressed, the "fresh start" promised by the bankruptcy code is designed for the "honest but unfortunate" debtor. <u>Grogan</u>, 111 S. Ct. at 660. Consequently, a debtor who schemes to cheat another is undeserving of a discharge. The crucial question in all such cases is whether there was some scheme to defraud another party. Here, the plaintiff's entire case is essentially summed up in this fashion: In 2006, the debtor lied to the plaintiff and told him either that he would never file bankruptcy, or that if he did, "I won't file on you." Almost three years later, the debtor's plan was realized when, after finally obtaining a favorable result in the state court trial, he was able to do what he intended to do all along - file for bankruptcy.

A party can prove an intent to deceive through direct evidence. Wrongful intent may also "logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan." <u>In re Sheridan</u>, 57 F.3d 627, 633 (7th Cir. 1995). Proof of the intent to deceive is measured by the debtor's subjective intention at the time the representation was made. <u>CFC Wireforms, Inc. v. Monroe (In re Monroe)</u>, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). As the court observed in the case of <u>Vozella v. Basel-Johnson (In re Basel-Johnson)</u>, 366 B.R. 831, 845 (Bankr. N.D. Ill. 2007), "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive."

The plaintiff's case hinges on the notion that the debtor "lied" about his intention to file bankruptcy. The first issue is what, precisely, the debtor told Mr. Davis. The debtor testified that he didn't remember telling Mr. Davis that he

wouldn't file for bankruptcy, or that he wouldn't file "on" this debt.  Mr. Davis, on the

other hand, was adamant that the debtor did in fact make this promise.  The

correspondence from Mr. Davis to the debtor indicates that Mr. Davis was quite

concerned about the "bankruptcy option" until their September 2006 meeting. After

that date, the letters are silent as to the possibility of bankruptcy.  It is certainly

possible to infer that something was said during that meeting which caused Mr.

Davis to believe the debtor didn't intend to file for bankruptcy.  For the sake of this

decision, the Court presumes that some sort of statement was made.  The problem

is that the plaintiff has not offered sufficient evidence of fraudulent intent or

justifiable reliance to justify a ruling in its favor.

    To begin with, pre-petition waivers of discharge or a promise not to file

bankruptcy are not enforceable.  See 11 U.S.C. § 524(a)(1) and (2) (a discharge

voids judgments and operates as an injunction against the continuation of any

action against a debtor personally, "whether or not discharge of such debt is

waived").  Post-petition waivers of discharge are only allowed in very specific

contexts, such as reaffirmation under § 524(c) or a court-approved waiver of

discharge under § 727(a)(10).  In Klingman v. Levinson, 831 F.2d 1292 (7th Cir.

1987), the Seventh Circuit rejected the contention that a provision in a state court

consent judgment under which the debtor agreed that the judgment was

nondischargeable in bankruptcy constituted a waiver of dischargeability.[29]  The

---

[29] 831 F.2d at 1296 n.3 ("Generally, all debts are dischargeable in bankruptcy
unless specifically excepted by a provision in the Bankruptcy Code.").  The bankruptcy
court decision, which the Seventh Circuit observed "properly noted" the legal standard,
was even clearer on this point.  While the bankruptcy court ultimately enforced the
(continued...)

court concluded that public policy does not permit a debtor, pre-bankruptcy, to

contract away the right to the discharge of a debt. <u>Id.</u> at 1296 n. 3.  In noting the

very narrow mechanisms for waiver of discharge under § 727(a)(10) and

reaffirmation under § 523(c), another court observed:

> Congress has only provided two methods for a debtor to waive the
> discharge of all debts or the dischargeability of specific debts.  Section
> 727(a)(10) permits a debtor to waive the discharge of *all* debts simply
> by executing a postbankruptcy written agreement that is approved by
> the bankruptcy court.  <u>See</u> 11 U.S.C. § 727(a)(10).  Similarly, a debtor
> may waive the dischargeability of a *specific* debt if the waiver satisfies
> the reaffirmation requirements of § 524(c).  <u>See</u> 11 U.S.C. § 524(c).
> Where Congress has failed to include language in statutes, it is
> presumed to be intentional when it has used such language
> elsewhere in the Code. [citation omitted].  Here, Congress' failure to
> authorize prepetition waivers of discharge, while at the same time
> authorizing certain postpetition waivers of discharge . . . must be
> viewed as intentional.

<u>Hayhoe v. Cole (In re Cole)</u>, 226 B.R. 647, 653-4 (B.A.P. 9th Cir. 1998). Put simply,

a prepetition waiver of the dischargeability of a debt undermines the purpose of the

bankruptcy code to give an honest but unfortunate debtor a fresh start, and the

prospective waiver of dischargeability of a debt is unenforceable.  <u>Id.</u> at 654; <u>see</u>

<u>also</u> <u>Giaimo v. Detrano (In re Detrano)</u>, 222 B.R. 685, 688 (Bankr. E.D.N.Y. 1998)

("As a matter of superseding federal bankruptcy policy, . . . a prepetition waiver of

a discharge of a particular debt or of all debts is against public policy and

---

[29](...continued)
judgment based on separate collateral estoppel grounds, it gave "no weight to that portion
. . . of the state court's order that specifically stated that the parties agreed that the debt
would not be discharged by the debtor in bankruptcy."  <u>Klingman v. Levinson</u>, 58 B.R. 831,
836 (Bankr. N.D. Ill. 1986).

unenforceable."); In re Minor, 115 B.R. 690, 694 (D. Colo. 1990) (waiver of

discharge must comply with provisions of bankruptcy code).[30]

In Bank of China v. Huang (In re Huang), 275 F.3d 1173 (9th Cir. 2002), the

debtor entered into a settlement agreement which, among other things, contained

a representation that the debtor would not file for bankruptcy.  Noting the principle

that it is against public policy for a debtor to waive the prepetition protection of the

bankruptcy code, the court then observed that, "This prohibition of prepetition

waiver has to be the law; otherwise, astute creditors would routinely require their

debtors to waive." Id. at 1177.  In this case, the plaintiff does not contend that the

debtor's representation constitutes an enforceable waiver of bankruptcy protection.

Instead, the plaintiff argues that the representation was fraudulent.  But this raises

an interesting question:  If a debtor makes a representation about filing bankruptcy

which is unenforceable by operation of that very same law, can a creditor complain

that he relied upon that representation to his detriment?  If so, one would assume

that astute creditors would, as the Huang court suggests, routinely require such

representations in order to complain that they were "defrauded" by a subsequent

bankruptcy filing.[31]

---

[30] A distinction must be made between simply "waiving" discharge and stipulating to
facts which, once subsumed into a judgment, may be given collateral estoppel effect.
Klingman, 831 F.2d at 1296 n.3 ("a debtor may not contract away the right to a discharge
in bankruptcy.  However, a debtor may stipulate to the underlying facts that the bankruptcy
court must examine to determine whether a debt is dischargeable").

[31] It is also worth noting that debtors and creditors alike often assume that it is
possible to avoid the discharge of a debt simply by not listing it in the schedules.  But even
an unscheduled creditor may have its claim discharged if it has actual knowledge of the
bankruptcy filing.  See 11 U.S.C. § 523(a)(3).

The plaintiff's argument is that he "trusted" the debtor, but arguably the creditor in <u>Huang</u> trusted the debtor to honor various prepetition representations about bankruptcy as well.[32]  A prepetition waiver of discharge "undermines the purpose of the Code." <u>Cole</u>, 226 B.R. at 654.  The same must be said of a prepetition promise not to file bankruptcy at all, which is essentially the same as a promise to forego the primary benefit afforded by filing.  <u>Huang</u>, 275 F.3d at 1177 (debtor's promise "not [to] enter bankruptcy" was unenforceable).  Logically, it seems inappropriate to find that a debtor's breach of a promise not to seek a discharge could serve as the grounds for a fraud claim when the debtor was simply exercising a statutory right.  Indeed, in <u>Minor</u> the court reached this very conclusion, finding that a debtor's breach of a promise not to seek discharge of a state court judgment did not constitute misrepresentation.  115 B.R. at 696 (the creditor's argument that the debtor's conduct amounted to misrepresentation was not persuasive).  At best, Mr. Davis obtained an unenforceable promise from the debtor not to file bankruptcy.  Turning that unenforceable promise into the basis of a nondischargeability claim would itself seem to undermine the purpose of the code, which is to grant debtors a discharge in all but those few cases in which fraud is clearly proven.

Even presupposing that this purported representation can serve as the basis of a nondischargeability claim, the plaintiff's claim collapses as it seeks to leap the

---

[32] Indeed, the agreement in <u>Huang</u> provided for a prepetition waiver of the automatic stay in the event of bankruptcy and contained a representation and acknowledgment by the debtor that the bank would not have entered into the agreement "[b]ut for Defendants agreeing to allow [the creditor] to have relief from the stay."  275 F.3d at 1177.

hurdles of fraudulent intent and reliance.  Essentially, the plaintiff argues that the

debtor's fraud arose from a misstatement of future intention – i.e., that he promised

not to file bankruptcy and didn't really mean it.  As this court noted a number of

years ago, a promise of future performance or intention is actionable as fraud if at

the time the statement was made, the debtor never actually intended to honor it.

Chevy Chase Bank, FSB v. Briese (In re Briese), 196 B.R. 440, 449 (Bankr. W.D.

Wis. 1996).  As the Restatement (Second) of Torts § 530(1) (1977) states, "A

representation of the maker's own intention to do or not to do a particular thing is

fraudulent if he does not have that intention."  Further, a promise as to the future

course of events "may justifiably be interpreted as a statement that the maker

knows of nothing which will make the fulfillment of his prediction or promise

impossible or improbable."  See Restatement (Second) of Torts § 525 cmt. f

(1977).  As far as misrepresentations are concerned, the debtor's rejection of the

"bankruptcy option" in his meeting with Mr. Davis could likely be characterized

more as an expression of opinion or a hope than a factual assertion, but the Court

will assume for the moment that it can be fairly regarded as a promise about future

events.

In Briese, this Court borrowed the classic cartoon characters of Popeye and

Wimpy to make the observation that while Wimpy always promised to pay on

Tuesday for a hamburger today, Wimpy is not guilty of fraud just because he

doesn't have the money when Tuesday rolls around.  A finding of fraud requires

evidence that he acted with an intent to deceive when he made the promise – that

when he told Popeye he would repay the loan, he never actually intended to fork

over the cash.  <u>Briese</u> at 451.  Transposing Wimpy to the present case, if Wimpy

told Popeye that he would pay him Tuesday for a hamburger today, and further

promised that he would not file bankruptcy on Monday, neither the failure to pay

nor the filing of bankruptcy, in and of themselves, would be actionable as fraud.

Hindsight in such cases is irrelevant; the fact that Wimpy filed bankruptcy on

Monday does not prove that he intended to do so when Popeye lent him the

money for a hamburger.  Instead, the question is whether Wimpy intended to file

bankruptcy all along, and whether his representation to the contrary masked the

knowledge that his promise would go unfulfilled.

Intriguingly, two cases featuring similar allegations were decided by other

courts shortly before the trial in this matter.  In <u>DePerno Law Office v. Sears (In re</u>

<u>Sears)</u>, 2010 WL 1664024, at *2 (Bankr. S.D. Ala. Apr. 22, 2010), the plaintiff was

an attorney who contended that the debtor had committed fraud by not disclosing

that he had obtained credit counseling and intended to file bankruptcy.  The court

noted that "the subsequent failure of the debtor to pay, without more, is not

sufficient to establish that the debtor lacked the intent to pay."  <u>Id.</u> at *3.  Finding

that plaintiff had failed to offer any factual evidence that the debtor "intended all

along" to deceive him, there was no evidence of fraudulent intent, and the debt

was determined to be dischargeable.  <u>Id.</u>

In <u>Andresen & Arronte, PLLC v. Hill (In re Hill)</u>, 425 B.R. 766 (Bankr.

W.D.N.C. 2010), a law firm contended that the debtor had fraudulently induced the

firm to continue its representation through a variety of email contacts in which he

promised to explore "other options" to pay the firm's fees, such as refinancing his

home.  The firm argued that the "false assurance of payment" justified a finding

that the fees were nondischargeable under § 523(a)(2)(A), especially since the

debtor did not disclose the fact that he had obtained credit counseling and was

considering filing bankruptcy.  Finding that the emails "illustrate a client

communicating about hope for future payment at an unspecified later date," the

court rejected the notion that the statements constituted misrepresentations.  Id. at

775.  Even an intentional breach of contract is not fraud under § 523(a)(2), and a

promise about future acts, without more, likewise does not constitute a

misrepresentation.  Id.[33]  Not even the debtor's failure to apprise the firm about the

impeding bankruptcy altered the outcome since the debtor did not have a duty to

disclose.  Id. at 776.

Fraud cases, especially those involving promises about future events, are

challenging to prove.  They require evidence of the debtor's subjective fraudulent

intent, which debtors are unlikely to confess.  Consequently, courts are left to

discern the debtor's intent from circumstantial evidence.  Here, the only

circumstantial evidence the plaintiff can offer is the timing of the bankruptcy filing,

in that it followed rather quickly on the heels of the settlement of the state court

action.  That might be considered suspicious, but it remains conceptually difficult to

connect the filing with an alleged fraudulent representation made more than two

---

[33]  Both Sears and Hill involve situations in which the debtor sought credit
counseling and prepared to file bankruptcy while the attorneys were still actively working
on their clients' behalf.  Here, the debtor did not seek credit counseling until after the state
court matter was resolved (in fact, the certificate of credit counseling filed with the court
indicates that the debtor obtained counseling on June 24, 2009).  The plaintiff did not offer
any evidence that the debtor actually consulted with a bankruptcy attorney while the state
court matter was pending.

years before.  During that time,  Mr. Davis wrote the debtor numerous times about

payment, and even considered withdrawing as counsel.  It does not appear that

the debtor made any additional "representations" about his financial condition, or

that he attempted to hide his difficulties from Mr. Davis.  Even the state court

settlement was something of a Pyrrhic victory given that he ended up owing more

than $12,000 in attorney's fees.  Quite simply, it appears he simply held out as

long as he could before filing bankruptcy.

    The plaintiff believes that the debtor represented that he intended to reject

the possibility of bankruptcy relief.  The Court questions whether the statement

was as absolute as the plaintiff suggests, and doubts that it is the sort of statement

that can serve as the basis of a claim under § 523(a)(2)(A) without far more

evidence of fraudulent intent.  The plaintiff's position appears to be that the debtor

plotted, or conspired, to discharge the attorney's fees, but there is no evidence that

the debtor didn't intend to perform in accordance with his purported promise at the

time he made it.  In fact, what remains incongruous about the plaintiff's argument is

that it was Mr. Davis who initially advised the debtor to file bankruptcy.  It was Mr.

Davis who told the debtor that filing bankruptcy would discharge his fees as well.

The debtor apparently told Mr. Davis that he was not going to file bankruptcy, or

words to that effect.  Mr. Davis says he believed the debtor.  However, when

advising and counseling the debtor about the practical implications of a filing (such

as the discharge of his own fees), Mr. Davis should have realized that it was

impossible for the debtor to "waive" the protection of the bankruptcy code.

Indeed, as between the two parties, Mr. Davis would have been in the better position to understand that under the bankruptcy code, pre-petition waivers of discharge or promises not to file are unenforceable.  And yet it is Mr. Davis who now contends that the debtor not only promised to waive the discharge of these fees, but also knew enough about bankruptcy law to realize that he could still discharge the fees despite the promise.[34]  After considering the debtor's testimony, the Court finds as a matter of fact that the debtor had no such knowledge.  To the extent he said anything to Mr. Davis about not filing bankruptcy, he intended to honor his obligation to pay the attorney's fees when the representation was made. There is no evidence to the contrary, or any proof that the debtor had any idea (or expectation) that he could somehow renege upon his promise.  There has been no showing of fraudulent intent or that the debtor obtained legal services from the plaintiff through a knowing misrepresentation or fraud.

The Court must also conclude that Mr. Davis did not justifiably rely upon the purported representation by the debtor.  Justifiable reliance is a minimal, subjective standard that encompasses "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."  Field v. Mans, 516 U.S. 59, 71, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995).  While justifiable reliance does not obligate a creditor to investigate everything a debtor says, the creditor may not "blindly" rely upon a misrepresentation which could have been proven

---

[34] In essence, Mr. Davis contends that his client knew more about bankruptcy law at the time of the "promise" not to file than an experienced attorney.

false through a "cursory examination or investigation." Id. If the surrounding

circumstances raise red flags, or if the creditor's own capacity and knowledge

would justify further investigation, a duty to investigate may arise. Id. at 72. In Hill,

the court rejected the law firm's argument that it justifiably relied upon the debtor's

promises of payment because it was a sophisticated party who proceeded with its

representation of the debtor despite "obvious warning flags." 425 B.R. at 777.

As early as September of 2006, Mr. Davis was aware that the debtor's

financial situation was precarious. He himself advised his client to consider

bankruptcy. Even after their September conversation, the debtor routinely failed to

make payments on the account, and the correspondence from Mr. Davis reflects

an escalating urgency regarding the fees. He clearly recognized the issue, and

even requested that the debtor consent to his withdrawal from representation. As

the Court has already noted, between an experienced attorney and a client relying

upon his advice, it was Mr. Davis who should have known that the prepetition

promise not to file bankruptcy was unenforceable. He was concerned enough to

worry that his fees might be discharged in bankruptcy, and an attorney in his

position could have exercised caution when evaluating a "promise" not to file from

a client. There were plenty of indications that the debtor was in dire financial

straits, and the facts reflect that Mr. Davis essentially ignored numerous red flags

and warning signs, opting instead to gamble that the debtor would pay his fees.

He cannot be said to have justifiably "relied" upon the promise not to file

bankruptcy, as even a cursory investigation would have led to the conclusion that it

was unreasonable to believe that the debtor might not ultimately seek a fresh start

under the bankruptcy code.  For all of these reasons, his claim under

§ 523(a)(2)(A) simply must fail.

### III.    Debtor's motion for attorney's fees under § 523(d)

The debtor seeks an award of attorney's fees under 11 U.S.C. § 523(d),

which provides that if a creditor requests the determination of dischargeability of a

consumer debt and the debt is discharged, the court shall award attorney's fees to

the debtor if the position of the creditor was not "substantially justified."  The

debtor's position is that the plaintiff should have known, long before the filing of this

adversary proceeding, that its fraud claims were unjustified.  At the close of the

trial, the Court requested that the debtor's attorney submit a bill of costs and fees.

The attorney did so, and has requested an award of $7,171.25 in costs and fees.[35]

In response, the plaintiff contends that the complaint was substantially justified and

that in any event the debtor's attorney should not be compensated for the time

associated with defending the motion to dismiss.

The purpose of § 523(d) is to discourage creditors from bringing actions in

the hopes of obtaining (or coercing) a settlement from an honest debtor desperate

to avoid the cost of litigation.  See Bridgewater Credit Union v. McCarthy (In re

McCarthy), 243 B.R. 203, 208 (B.A.P. 1st Cir. 2000); Manufacturers Hanover Trust

Co. v. Hudgins, 72 B.R. 214, 219 (N.D. Ill. 1987).  For the debtor to prevail on the

request for fees, he must prove that the creditor requested a determination of

dischargeability, the debt was a "consumer debt," and the debt was discharged.

---

[35] This amount includes $908.75 in costs and attorney's fees at a billable rate of
$125.00 hour.

American Express Travel Related Servs. v. Baker (In re Baker), 206 B.R. 507, 509

(Bankr. N.D. Ill. 1997).  Once these elements are shown, the burden shifts to the

creditor to show that the action was substantially justified.  Phillips v. Napier (In re

Napier), 205 B.R. 900, 908 (Bankr. N.D. Ill. 1997).[36]

For a creditor to be "substantially justified" in filing a fraud-based

nondischargeability complaint, there must have been a reasonable basis for doing

so in both law and fact.  First Card v. Hunt (In re Hunt), 238 F.3d 1098 (9th Cir.

2001).  Where the evidence presented at trial had "virtually no tendency" to show

that the debtor lacked the intent to repay the debt, it is appropriate to find that the

complaint lacked substantial justification.  Id. at 1103.  Put another way, courts

frequently ask whether the action had a reasonable basis in truth for the facts

alleged, a reasonable basis in law for the theory propounded, and a reasonable

support in the facts alleged for the legal theory advanced.  See McCarthy, 243 B.R.

at 208 (citing Brinker v. Guiffrida, 798 F.2d 661, 664 (3[d] Cir. 1986)).  It also means

that the creditor must meet a higher burden than simply justifying the complaint

under Fed. R. Bankr. P. 9011.  See Pierce v. Underwood, 487 U.S. 552, 566, 108

S. Ct. 2541, 101 L. Ed. 2d 490 (1988) ("To be substantially justified means, of

course, more than merely undeserving of sanctions for frivolousness").[37]

---

[36] A consumer debt is defined as debt "incurred by an individual primarily for a
personal, family, or household purpose."  11 U.S.C. § 101(8).  Clearly the plaintiff's claim
for attorney's fees qualifies under this section.  Likewise, the creditor filed the adversary
proceeding and the debt has now been found dischargeable.  Consequently, the debtor
has met its burden under § 523(d) for an award of fees.

[37] Section 523(d) was patterned after the Equal Access to Justice Act, 28 U.S.C.
§ 2412(d)(1)(A), and courts have typically looked to cases interpreting the EAJA, such as
(continued...)

Since it is the creditor's burden to demonstrate substantial justification, it is

incumbent upon the plaintiff to illustrate how the evidence presented to the Court

supported his case.  Hunt, 238 F.3d at 1103-4.  The allegations about the debtor's

alleged fraudulent scheme to induce the plaintiff to continue representing him,

however, find absolutely no support in the record.  Certainly Mr. Davis felt wronged

by the debtor.  But feeling wronged and being wronged are not the same thing,

and *proving* wrongdoing is yet another matter.  In the case of Chase Bank USA v.

Landry (In re Landry), 2009 WL 959421, at *2 (E.D. Wis. Apr. 7, 2009), the court

observed that it was "at a loss to discern" what evidence supported the creditor's

notion that the debtor was engaged in fraud, and stated:

> [The creditor] bandies about such terms as recklessness, insolvency,
> and "overextended lifestyle" as though they are dispositive of
> something, when in fact they are simply the meat and potatoes of
> consumer bankruptcy.

Likewise, in the present case all the plaintiff offered the Court was a purported

promise made two years prior to the filing in a conversation the debtor only vaguely

remembered.  There were no repeated promises, no half-truths, no concealment of

financial condition, and no evidence of fraudulent intent at all.  The feeling that

wrongdoing occurred, while undoubtedly genuine, is not evidence; it proves

nothing more than a sense of injury.

The plaintiff's case centered around an unenforceable promise not to file

bankruptcy.  Mr. Davis realized his fees might be subject to discharge, and he very

---

[37](...continued)

Pierce, for guidance in construing § 523(d).  See In re Hingson, 954 F.2d 428, 429 (7th Cir.
1992).

easily could have ascertained that a prepetition waiver of bankruptcy protection was not enforceable.  He also should have realized before filing this adversary proceeding that he had no evidence tending to support the claim that the debtor actually intended to file bankruptcy in September of 2006 but deliberately waited until 2009 so as to discharge the attorney's fees.  Even if he did not realize this problem prior to filing, he should have recognized it long before the matter went to trial.  The debtor had no choice but to defend the adversary proceeding.  Mr. Davis, however, could have chosen to recognize the flaws in his case and abandon it, but did not.  Under § 523(d), a victorious debtor is entitled to an award of fees unless the creditor's claim was substantially justified.  The gaping hole in the plaintiff's case cannot be ignored, and the Court must conclude that Mr. Davis has not shown that the claim had a reasonable basis in law or fact.

An award of fees and costs is therefore appropriate.  After reviewing the affidavit of the debtor's attorney, the Court finds both the costs and the hourly rate requested to be reasonable.  However, the plaintiff's concern about the time expended defending the motion to dismiss and/or to revoke the discharge is well taken, as those amounts are not properly included in a fee award under § 523(d).  A review of the time records submitted by the debtor's attorney indicates that approximately $2,000.00 of the requested fees were devoted to responding to that motion.  The Court finds it appropriate to award $5,000.00 to the debtor as constituting a reasonable amount for fees and costs under § 523(d).

Accordingly, the defendant shall have judgment against the plaintiff dismissing this adversary proceeding and awarding the sum of $5,000.00 in attorney's fees and costs to the defendant pursuant to § 523(d).

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

Dated: August 13, 2010

BY THE COURT:

/s/ Thomas S. Utschig

Hon. Thomas S. Utschig
U.S. Bankruptcy Judge